Filed 3/4/22  P. v. Stinson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C087504 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FECOD-2017-0000918) |
| v. | |
| ANTUAN JERMALE STINSON, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C087504 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FECOD-2017-0000919) |
| v. | |
| HAROLD MILES, | |
| Defendant and Appellant. | |

1

Codefendants Antuan Jermale Stinson and Harold Miles were convicted of the murder and attempted robbery of T.L. (the father), the attempted murder of T.L.'s son (the son), and the killing of T.L.'s dog (the dog).

On appeal, Stinson and Miles jointly argue that (1) the prosecutor committed misconduct during closing argument; (2) the trial court erred in declining to declare a mistrial based on juror misconduct; and (3) the trial court erred in denying their challenge to the prosecutor's use of peremptory challenge to dismiss a juror.

Stinson separately challenges his convictions related to killing the dog, arguing the jury instructions were erroneous and the evidence was insufficient. Stinson also contends that (1) there was insufficient evidence to support the special circumstance finding that he acted as a major participant in the commission of the attempted robbery with reckless indifference to human life; and (2) there is an alleged ambiguity in his sentence resulting from a purported conflict between the court's tentative sentence and its imposed sentence.

For his part, Miles contends the trial court erred in denying his motion for acquittal for the attempted murder of the son. In supplemental briefing, Miles argues in the alternative that the instructions relating to the attempted murder charge violated his Sixth Amendment rights and were infirm under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437).

Finding codefendants' arguments without merit, we will affirm.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

In November 2015, the father lived in a triplex, along with the son. A common courtyard led to the front door of the duplex. An iron gate separated the courtyard from the street, and the gate was kept locked. An additional metal security door secured the

---

[1] The panel as presently constituted was assigned this matter in June 2021.

entrance to the father's home. The security door could be opened only by using a key to unlock a double deadbolt. The father sold marijuana and often had some at the house, along with large amounts of cash. He also owned a pit bull.

Stinson and Miles lived in separate residences on the same street as the father; they were familiar with the father and had been to his home. The father was so familiar with Stinson that he nicknamed him "little nephew."

On November 4, 2015, the father was home with his girlfriend, his girlfriend's two children, and the son. At one point, the father left to get air in his car's tires. Two men wearing black hoodies approached the front gate and asked one of the girlfriend's children if the father was there. The men sounded mad. The child told them the father was not there, and the men left. The child testified one of the men was Stinson.

The father eventually returned home. The girlfriend heard him arguing with someone outside. She heard the father beg, "Just take the money. That's all I have." The father continued, "Please, just take it. My family's in there. It's right there. Don't kill me." The girlfriend heard a "tussle," so she told the son to check on the father. The girlfriend then heard multiple gunshots and hid with her children under a bed.

The son, who was unarmed, ran to the front door but he could not open the locked security door. Through the security door, the son saw the father and a man in a black hoodie grabbing each other in the courtyard. Although the son did not recognize the man at the time, he later identified him as Miles. The son then ran out the back door of the house, jumped over a fence into his neighbor's yard, and ran toward the front of the house. After the son ran out the door, one of the girlfriend's children heard a dog barking. The child then heard more gunshots.

Meanwhile, as the son was running outside towards the front of the house, he also heard gunshots. It sounded as if the shots were coming from the front of the house. As the son climbed to the top of another fence to get to the father, he saw and immediately recognized Miles, who appeared unarmed, and Stinson, who was using both hands to

3

hold a shotgun. Stinson shot the son and he fell. The son screamed and asked Stinson what he was doing. The son stood up and retreated to the backyard. As he was running, he heard another shot, and it sounded the same as Stinson's first shot at him. The son eventually got back into the father's house. The son's chest hurt, and he discovered that had been hit in the chest with shrapnel from the shotgun.

The son looked out the father's front door and saw Miles and Stinson running down the street toward the corner. He did not notice anyone else, but he kept his focus on the two men. The son then saw the father lying face down, bleeding and unresponsive. Medical help arrived, but the father died at the scene from 18 gunshot wounds, including three to his chest and abdomen. The son later identified Stinson and Miles in a police photo lineup.

A.    *Additional witness testimony*

Four witnesses who were near the father's home at the time of the incident testified they heard gunshots. One witness testified he heard a shot from a handgun followed by a pause and then a shot from a shotgun.

A neighbor also testified he heard four to five gunshots as he was standing outside his home. He then saw two men try to enter a house. One of the men had a "fade" haircut, and the other had dark hair with the tips dyed a lighter color, possibly yellow. Based on news reports, the neighbor later recognized the man with the fade haircut as Miles. The neighbor heard Miles tell his companion, "Put that gun in your pants." The two men then took off running at a "frantic pace." The neighbor saw a gun barrel sticking out of the top of the pants of the man with the dyed hair. The firearm appeared to be a rifle or a shotgun.

The day after the shooting, the neighbor picked Stinson and Miles out of a police photo lineup. The investigating officer testified the neighbor made the identification without hesitation. The neighbor testified he told police at the time that he had seen the same individuals on the police department's Facebook page earlier that morning before

4

the lineup, and he thought they looked like the men he had seen just after the shooting. The neighbor denied that he picked out the men because he had seen them on Facebook.

A fifth witness who was driving in the area testified he saw a pit bull running in the street. He then saw three men run around a corner and get into a parked vehicle, with two getting in the front and the third getting in the back. All three men wore black hoodies.

B.    *Police investigation*

Police arrived and found bullet holes in the fence. In the backyard, they found the father's dog shot dead. Police found $65 cash inside the father's shirt breast pocket. While searching the father's home, they found a loaded .40-caliber handgun in the master bedroom. Police did not find any empty casings associated with the gun and they did not find any other weapons in the home.

Police found marijuana in the kitchen, two digital scales, plastic sandwich baggies, and foil bags. There also were plastic baggies containing marijuana. A detective testified at trial that, in his opinion, the items found indicated the marijuana was intended for sale.

Police found multiple bullet casings, expended bullets, and bullet fragments in or near the courtyard, garage, driveway, and front door. In all, police found seven .45-millimeter casings and nine .10-millimeter casings at the scene. Police also found one .223 cartridge (live round) in the driveway, one casing in the garage, and one casing in the front yard of the house next door. In addition, there was a bullet strike in the fence that separated the father's house from the neighbor next door.

The forensic pathologist who conducted the autopsy on the father opined the shooter had used a handgun, probably a .10-millimeter or .45-caliber, rather than a rifle or shotgun. In addition, the father had been shot from at least three feet away.

Police initially detained the son as a suspect. They also detained Miles the next day in a nearby home, where they also found four live 12-gauge shotgun shells. Police

found no other ammunition or weapons in the home. Stinson was arrested four months after the shooting.

      C.    *Stinson's testimony*

Stinson testified that on the day of the shooting he was inside his home when he heard gunshots. He looked out his front door and realized his dog had run outside. Scared his dog would get hurt or hurt someone, Stinson grabbed his loaded rifle and went outside to find his dog.

Stinson then saw a man coming over the neighbor's fence holding a handgun. Stinson did not recognize the man, who wore his hair in dreadlocks. Scared, Stinson fired a single shot above the man in an attempt to scare him. The man fell, and Stinson began running. Stinson saw Miles, who is Stinson's brother-in-law. Miles, who was not holding a gun, seemed "[f]rantic." Stinson asked Miles to help him find his dog, and Miles agreed. The two ran as they searched for Stinson's dog. At one point, Stinson put his gun in his shorts. They eventually found the dog about four blocks away, and they went to the liquor store to buy cigarettes.

On the way home, Stinson noticed a lot of police. He did not know why they were there. The area had been taped off, so they headed to the nearby home of Stinson's mother. Stinson and his girlfriend then headed to Sacramento, so he could see his children.

The next day, Stinson learned that the father had been shot and killed, and that he and Miles were suspects. He stayed in Sacramento for a month, and then went to Fresno for at least a month so he could spend time with his other children. Stinson finally returned to Stockton in March 2016 so he could turn himself in. Before he could do so, he was arrested in a traffic stop.

D.   *Verdict and sentencing*

In April 2018, the jury found Stinson guilty of first degree murder of the father (Pen. Code, § 187, subd. (a));[2] attempted second degree robbery of the father (§§ 664, 211); attempted first degree murder of the son (§§ 664, 187, subd. (a)); and animal cruelty by shooting or killing a living dog. (§ 597, subd. (a).) The jury also found Stinson committed the murder while committing a robbery. (§ 190.2, subd. (a)(17)(A).) The jury found not true the firearm enhancement allegations to each of the charges against Stinson. (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)

On the same day, the jury found Miles guilty of attempted second degree robbery of the father (§§ 664, 211) and attempted first degree murder of the son. (§§ 664, 187, subd. (a).) In finding Miles guilty of first degree attempted murder, the jury found true that Miles committed the attempted murder willfully and with deliberation and premeditation. The jury found not true the firearm enhancement allegations to each of the charges against Miles. (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)

The jury was deadlocked on allegations that Miles committed first degree murder of the father (count 1), and that Miles and Stinson unlawfully possessed a firearm (counts 5 & 6), and the court declared a mistrial as to those counts.

The court sentenced Stinson to life without the possibility of parole for the murder charge; the upper term of three years, stayed pursuant to section 654, for the attempted robbery charge; life with the possibility of parole for the attempted murder charge; and the upper term of three years consecutive for the animal cruelty charge. The court also imposed various fines and fees.

---

[2]   Undesignated statutory references are to the Penal Code.

The court sentenced Miles to six years (the upper term of three years doubled) for the attempted robbery charge, consecutive to life with the possibility of parole for the attempted murder charge. The court also imposed various fines and fees.

DISCUSSION

I

Stinson and Miles contend the prosecutor committed prejudicial misconduct by arguing that adverse inferences should be drawn against them because they failed to produce two individuals—Michael Deloach and Freeman Owens—as witnesses.

The Attorney General argues defendants have forfeited the issue because their counsel failed to request an admonition or object to the prosecutor's final comment on the potential witnesses' presence. (See *People v. Tully* (2012) 54 Cal.4th 952, 1037-1038 [a defendant who fails to object on the grounds of misconduct and to seek an admonition generally forfeits the claim on appeal, unless the harm would not have been cured by an admonition].) Defendants respond their counsel were ineffective for failing to request an admonition or object to the prosecutor's final statement during closing argument. Regardless, we find defendants' contentions meritless.

A. *Additional background*

The parties stipulated that police investigated four local unsolved shootings occurring between September 2015 and May 2016 from which police collected live ammunition and expended bullet casings, in addition to a firearm retrieved during an arrest in a fifth case.

The defense ballistics expert testified he analyzed the .10-millimeter casings found near the father's body and concluded the bullets were fired from a Glock handgun. The expert also determined that the .10-millimeter pistol used during the father's shooting

8

was used in three of the unsolved crimes that occurred between September 2015 and May 2016.[3]

During trial, evidence was presented that indicated similar handguns were connected to Owens and Deloach, who were not charged in this case. Police searched a residence where Owens and Deloach stayed (the "Saratoga house") and found a black mask, a Glock magazine loaded with .45-caliber ammunition, and a Social Security card belonging to the son. They also found a backpack with more ammunition and cases for two Glock handguns in the garage. Deloach's wife told police the backpack belonged to Owens and Deloach. Evidence also was presented that indicated Owens and Deloach were involved in additional crimes, including robberies of cannabis delivery people.

Evidence was introduced that Miles had over 150 phone contacts with Owens between September 27, 2015, and the day of the shooting. Stinson had 15 to 20 phone contacts with Owens during the same period.[4] Some of the calls with Owens on the day of the shooting pinged a cell tower that indicated Owens was near the scene of the shooting. Police found Owens's palm print on the father's car.

---

[3]     Stinson states in his opening brief that there was evidence presented at trial that .45-caliber bullet casings found at two other crime scenes were fired by the same Glock firearm as some of the bullet casings recovered near the father's body after the shooting. Additionally, in a third case, police responded to a call about an armed man and found a .45-caliber Glock on the other side of the fence from a man named Michael Deloach, who was seen throwing something over a fence and was wearing an empty gun holster. Although the portion of the record cited by Stinson in support of this proposition includes evidence that the same .45-caliber Glock firearm was used in the separate crimes described in Stinson's brief, our review of the record found that the testimony did not address whether the gun was the same one used in the shooting of the father. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 276 [on appeal it is the " ' "duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing *exact page citations*," ' " original italics].)

[4]     Stinson testified he knew Freeman Owens and Michael Deloach, as well as Deloach's wife. He would hang out with them at the Saratoga house.

At the request of Stinson's counsel, the court ordered that Deloach and Owens, who were in custody for different crimes, be transported to court to testify at trial. In the end, neither man was transported, and neither man testified.

During closing argument, the prosecutor reminded the jury that "[n]o one else is on trial in this case" except for Stinson and Miles. The jurors were told they were "not [t]here to make a determination on anyone that has been suggested to you. . . . So please make sure that you keep focused on why you're here, not on something else."

Stinson's counsel challenged the evidence presented against Stinson and also argued third party culpability, arguing it did not make sense that Stinson would have ambushed the father, given their relationship. Counsel also pointed to a statement from a witness that he had seen more than two men fleeing the shooting scene. In addition, counsel argued Owens's palm print was found at the scene of the shooting. When police searched the home where Owens and Deloach were staying, they found ammunition, the son's Social Security card, and a black mask, as well as a backpack containing more ammunition in the garage. Police also found documents related to the victims of other crimes, including the cannabis delivery people, and at least one victim identified Owens. Counsel also noted that their expert had connected at least one of the guns used in the shooting to other local crimes, and that the .45-caliber gun thrown by Deloach had been linked to other local crimes. The shooter(s) who killed the father had used a .10-millimeter Glock and a .45-caliber firearm. In addition, phone records suggested Owens was in the area around the time of the shooting. Counsel argued this evidence cast doubt on defendants' involvement in the crimes at issue here. At one point, defense counsel asked the jury to disregard the prosecutor's statement, "Let's not talk about other people who aren't sitting here. Let's only talk about people who are named as parties."

Miles's counsel suggested it was unclear whether Owens or Deloach had killed the father, and reminded the jury it was not a defendant's burden to figure out who the actual killer was.

10

During rebuttal, the prosecutor encouraged the jurors to "look at every single piece of evidence," which she argued showed defendants were guilty. She argued the defendants were asking the jury to believe that a group of people was involved in the shooting of the father, and that it was Deloach and Owens, because Owens was connected to at least one other robbery. But the son identified Stinson initially to police (not Owens), and no one saw anyone else leaving the courtyard. Not even Travis had seen more than two men fleeing the scene. In addition, Stinson acted like a guilty man by leaving town for several months after the shooting. Stinson also was connected to the Saratoga house, where the suspicious items were found. And Deloach was never connected to the other robberies. Although Deloach was found with a gun similar to that used to kill the father, that was three to four months after the shooting, and guns were transitory.

The prosecutor continued: "And this is the danger of what you're being asked to do. You're being asked to convict people without evidence. The people aren't here to vouch for Mr. Deloach or for Mr. Owens, but they don't have any different rights than anyone else and there's a reason they are not sitting here." Stinson's counsel objected, arguing the prosecutor's argument "misstates the facts and also calls for legal conclusion. Not asking them to convict Mr. Deloach or Mr. Owens." The court sustained the objection.

The prosecutor continued: "By the argument you're being told they did it. That's what the argument is. And in essence, that's what they want you to believe. We're not here for Mr. Deloach. We're not here for Mr. Owens. Why didn't they bring those people in here? Why not? I mean, that's a reasonable thing you would expect. This is the theory. Why aren't they here?"

Stinson's counsel again objected and argued in a bench conference: "I'm sorry, I really don't like interrupting. I don't like interrupting closings, that I really wouldn't have except I think it's improper to argue that we really believe that these people were

11

involved, then we should have brought them here. Counsel knows that we and the Court signed orders to transfer, but their presence was requested here. It was ordered here, but they were disobeyed by the prison and jail authorities so we couldn't get them here. I think that the People should not be entitled to argue that knowing that we made efforts to get them here and their failure to be here is not by our fault or by our lack of trying." Miles's counsel argued, "It shifts the burden." The prosecutor responded, "No, I've never talked about a burden shifting to anyone. What I'm talking about is, and we have the right to make—what evidence they made, all diligent those efforts were, how far in advance it is, I don't have knowledge of. But the People have the right, as do they, to make a comment on a reasonableness of who could be anticipated. They made the same argument." Miles's counsel responded that even if they had been able to call Owens and Deloach, they could have invoked their Fifth Amendment right to not testify, and they "wouldn't be in front of the jury." The court responded, "Let me just say this. There is a difference of saying they are not here as opposed to they didn't bring them here knowing that they did try to get them here, so I'm going to sustain the objection. But it is not shifting the burden because [the People] can comment on it. Sustained."

The prosecutor resumed her argument in front of the jury: "They are not here. There's a reason they are not here. Because there is no evidence to support, but again, even if you go with the theory of that you've been argued to, it doesn't change the facts of their involvement. So that's what's dangerous is to start engaging in discussion of other people that are not a part of this case. And Michael Deloach and Freeman Owens are not a part of this case. They are just not. They are a convenient excuse to try to again throw you off the scent of the facts and give you an excuse for not doing what you're supposed to do, which is to follow the law and follow the evidence as presented here." The prosecutor then continued to cast doubt on the defendants' theory that there were other people involved in the shooting. At one point, she stated: "Mr. Owens isn't here. These two defendants are here. They are the people you make a decision about. And you

12

make sure that when you do that you do it based upon the facts and the law and with the evidence and not with some wild haired theory that is absolutely made of fiction." She then encouraged the jury to find defendants guilty.

      B.    *Applicable law and analysis*

     In California, a prosecutor commits misconduct if her " 'pattern of conduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to persuade either the court or the jury.' " ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) When a prosecutor's comments before a jury are at issue, we consider whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Clair* (1992) 2 Cal.4th 629, 663-664.)

     A prosecutor has "wide latitude" during argument and may comment vigorously on the evidence, so long as the comment is fair. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Generally, it is not misconduct for the prosecutor to comment upon the failure of the defense to call logical witnesses other than the defendant. (*People v. Medina* (1995) 11 Cal.4th 694, 755.) However, a prosecutor may not comment on the absence of a witness if that witness has asserted his privilege not to testify, cannot be located, or is otherwise unavailable. (*People v. Ford* (1988) 45 Cal.3d 431, 435-436, 444-445.) In those circumstances, a jury could view such a comment as an invitation "to speculate that the defendant's failure to call the witness reflects recognition that the testimony would not be favorable to the defense. Although the evidence might support that inference, it is improper to invite a jury to draw the inference if the jury is unaware of an equally plausible inference that the witness has not been called because he cannot be located." (*Id.* at p. 445.)

Defendants argue that the prosecutor knew defense counsel had taken steps to attempt to call Deloach and Owens as witnesses, including getting a court order for transportation. According to defendants, the jury would have interpreted the prosecutor's comments that there was "a reason" why Deloach and Owens were not at trial as an invitation to infer that defendants knew Deloach and Owens would implicate defendants as aiders and abettors in the attempted robbery and murder. Defendants note that the jury found the gun enhancements against defendants to be not true, suggesting the jury concluded the father was actually killed by Deloach and Owens, and that defendants were only guilty because they had aided and abetted the crimes of Deloach and Owens. Even though the trial court twice sustained defense counsel's objections, defendants contend reversal is required because the trial court rejected counsel's objection that the prosecutor's comments had shifted the burden of proof, and because the trial court failed to admonish the jury about the prosecutor's improper comments.

Despite defendants' contentions, we find it is not reasonably likely that the jury was misled into drawing an improper inference regarding the failure to Owens and Deloach to testify as witnesses. The trial court twice granted objections by defense counsel to the prosecutor's comments about the absence of Owens and Deloach, even granting a bench conference to address the issue. This would have indicated to the jury that the prosecutor's first two comments were improper, especially since she refocused her argument each time. Moreover, viewed in context of the entire argument (including defendants' robust argument that Deloach and Owens were the guilty parties), the prosecutor's remarks can only be seen as a reminder to the jury that it should ignore people who were "not a part of this case" and instead focus on whether defendants were guilty of the charged crimes.

Given our conclusions, we need not address whether defense counsel provided incompetent representation in failing to request an admonition or object to the prosecutor's third rephrasing of her argument.

14

II

We turn next to defendants' contention that the trial court erred in declining to declare a mistrial based on juror misconduct. We are not persuaded.

A.    *Additional background*

Six weeks into the trial, a visitor who was friends with Stinson overheard jurors complaining to each other during a break that their time was being wasted, the trial was taking too long, and they wanted to get back to their lives. She also heard Juror No. 1 say to the other jurors, "I don't understand why they just didn't take a deal and save us the time." None of the other jurors responded. The visitor informed one of Stinson's lawyers, and he informed the court, expressing concern that Juror No. 1 was prejudiced and had potentially prejudiced other jurors.

The court proceeded to question each juror individually. Juror No. 1 denied saying that he felt his time was being wasted, or that defendants should take a plea deal. He acknowledged comments made to other jurors that the attorneys were "spending a lot of time on things" and forcing jurors to stand in the hallway for long periods. According to Juror No. 1, there was a general sense among the jurors that they did not like how the jury was being treated. He also was "curious and baffled" by some of the testimony, and he and some of the other jurors had commented that some of the witnesses had been unable to remember some things. He repeatedly stated neither he nor any other juror had formed any opinion in the case. He also stated that there was nothing impacting his ability to be a fair and impartial juror in the case.

The court reminded Juror No. 1 that they must not discuss anything about the case, including the length of trial, witness memory, or what the attorneys were doing. The court recognized that it was uncomfortable to stand in the hall and also reminded the juror that the actions of the attorneys must not be imputed to their clients. The court ordered Juror No. 1 not to discuss anything with his fellow jurors, and then questioned the remaining 11 jurors and six alternates. If one of the jurors brought up additional

15

information (such as a new potential improper comment), the judge would ask each juror about it, including bringing jurors back in as necessary. The judge also explained again that jurors must not discuss anything about the case, and asked them to promise that they would ask fellow jurors to stop if they heard anything that was against the rules.

During the interviews, nine of the jurors told the judge they had heard complaints about the length of the trial or the frequency and lengths of the breaks during which the jury was sent into the hall. Alternate Juror No. 6 reported Juror No. 1 was complaining about the constant breaks in the hallway and had said the trial was "ridiculous," and if something did not happen, he would call his lawyers. Eleven jurors had talked about the existence of a medical marijuana Web site that had been mentioned during the trial. Eight jurors had heard general jokes about witnesses' inability to remember. More specifically, Juror No. 10 had asked Juror No. 1 how he had gotten out of the court parking garage so fast, and Juror No. 1 responded jokingly, "I don't know. I can't remember." Juror No. 11 had heard "a little bit" that some jurors felt that defendants should have taken a deal to avoid trial. No other juror had heard such a comment. Juror No. 7 had heard someone say "it would take [him] 15 seconds to make up [his] mind if we were going to deliberate." He could not remember who said it, except that it was a man. No one else heard such a comment. No juror had heard substantive comments about the case, no one stated they had reached a conclusion about the case, and each juror stated he or she remained fair and impartial.

The court next spoke again with Juror No. 1, who told the court he never said he would contact his attorney if the jury kept being sent out into the hall. He answered no when asked if he heard anyone say they could decide the case in 15 seconds. He did admit, however, to commenting that, in his opinion, there were a few seconds of testimony that were critical for judging the case. He reiterated he had not yet made a decision on the case, but he considered that period of time important and expected to deliberate about it.

16

Stinson moved for a new trial. He argued several of the jurors had discussed the facts of the case and formed opinions about the defendants' guilt prior to the conclusion of evidence and submission of the case. Jurors had mocked witnesses who could not remember things, and some had said they thought defendants should have taken a deal. Jurors had also complained about how the jury was being treated, with Juror No. 1 threatening to call his lawyer. And one juror said it would take him 15 seconds to reach his decision. Stinson argued it was insufficient to merely remove Juror No. 1 or any other individual juror, because the entire jury panel had been prejudiced against defendants. It also was impossible to determine who had made the improper comments, since the jurors generally refused to identify the speaker or stated that multiple people had made the comment at issue.

Miles originally moved to dismiss Juror No. 1, but later joined in the motion for a new trial. He was primarily concerned by the comments from multiple jurors that the defendants should have taken a plea deal, and the comment by one juror that he could make his decision in 15 seconds.

The prosecutor agreed to release Juror No. 1, given his comments, but argued it was unnecessary to have a new trial. She noted that many of the jurors appeared shocked by the court's questions, and that making jokes about whether someone can remember things did not rise to the level of impropriety requiring a new trial. In addition, acknowledging the existence of a marijuana Web site that had been mentioned by a witness was not discussing the evidence. Moreover, there was nothing to suggest that anyone other than Juror No. 1 had talked about a specific timeframe that would be important for deliberations. The other jurors said they had not yet made up their minds, and they could be fair and impartial.

The court removed Juror No. 1 but denied the motion for mistrial. Although Juror No. 11 said multiple jurors suggested defendants should have taken a plea, no other juror said they had heard that. Every juror said they had not yet made a decision, and that they

17

could be fair and impartial in the case. The court reasoned the burden for a mistrial was high, and it had not been met here.

B. *Applicable law and analysis*

Echoing their arguments at trial, defendants claim on appeal that some of the jurors were "being less than forthright." They contend it is not probable that no other juror would have heard Juror No. 1's comment that he thought the case would be determined based on a few seconds of time, especially since Juror No. 7 heard someone say that it would only take 15 seconds to decide the case. Or that only Juror No. 11 heard multiple jurors saying defendants should have taken a deal. Defendants also note that only Juror No. 2 heard discussion of time being wasted, and only Alternate Juror No. 6 heard Juror No. 1 threaten to call his lawyers if they were sent out to the hall again. Only some of the jurors admitted they heard jokes about witness memory, and several defense witnesses repeatedly stated, "I don't recall" on the stand. Given this reticence to admit misconduct, defendants argue, the court should have disregarded jurors' assurances about impartiality and a new trial should be ordered.

A defendant has "a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 [citing U.S. Const., amends. VI & XIV; Cal. Const. art. I, § 16].) The jury's impartiality may be challenged by evidence of statements made that are " 'of such a character as is likely to have influenced the verdict improperly.' " (*Hamilton, supra*, at p. 294, italics omitted.)

Juror misconduct raises a presumption of prejudice that may be rebutted by a showing there is " 'no substantial likelihood that one or more jurors were actually biased against the defendant.' " (*In re Manriquez* (2018) 5 Cal.5th 785, 797, italics omitted.) We review for substantial evidence a trial court's determination that misconduct occurred, but we independently review whether prejudice arose because it is a mixed

question of law and fact. (*People v. Majors* (1998) 18 Cal.4th 385, 417.) "Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

"The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.]" (*In re Hamilton, supra*, 20 Cal.4th at p. 296.) As courts have cautioned, "the criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias." (*In re Carpenter* (1995) 9 Cal.4th 634, 654-655.)

Here, upon learning of the alleged improper comment, the court immediately interviewed each juror. In addition to asking about the specific comment, the court asked open questions in order to elicit additional information and assess the extent of any prejudice. When jurors mentioned potential additional improper comments, the court asked the other jurors about those too, and even brought back jurors for additional questioning as needed. The court also explained again what jurors were allowed to discuss, and the jurors promised they would tell other jurors to stop if they started talking about improper subjects.

With the exception of the comments by Juror No. 1, whom the court properly excused, these interviews revealed that jurors briefly discussed the existence of a marijuana Web site, complained about waiting in the hall where it was hot and there was no seating, and made some general jokes about people's ability to remember things. These limited comments do not rise to the level of evidence "of such a character as is

19

likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).) Moreover, they do not outweigh the jurors' statements that they had not heard anything substantive discussed about the case, that they did not consider the trial to be a waste of time, and that they had not prejudged the case. In addition, each juror stated he or she could remain fair and impartial. In sum, there is no indication that the jurors were actually biased, and the trial court did not err in denying defendants' new trial motion.

III

We turn next to defendants' argument that the trial court violated their Sixth and Fourteenth Amendment rights in dismissing a prospective African-American juror based on her expressed belief that the likelihood of a fair trial in a criminal case depended on one's race. As defendants acknowledge, current California Supreme Court precedent compels us to find this argument without merit.

A.    *Additional background*

During voir dire, Prospective Juror D. (D.), who is African-American, stated she worked as a psychology technician with the Department of Corrections and Rehabilitation. She believed that, depending on one's race, one had a "different outcome" in the criminal justice system and ran the risk of not getting a fair trial. When asked, she said she would not hold the prosecutor to a higher standard of proof than beyond a reasonable doubt. She also said that her decision would not be affected by the fact that defendants were African-American, and she would apply the law as given by the trial court. Her work with inmates would not affect her ability to be a fair juror in this case. Although she formed quick and strongly held opinions, she did not think she would find it difficult to communicate with others during deliberations.

D. said she felt she would give everyone a fair chance in the case. Although she was somewhat uncomfortable being questioned in the courtroom during voir dire, D. again stated she would be fine deliberating with the other jurors. Although she did not think that the system was fair for everyone (including African-Americans, Latinos, and

20

Asian-Americans), she was not concerned that defendants (who were African-American) would fail to get a fair trial. She felt people perceive each other differently, depending on their race. Still, she would base her decision on evidence and facts.

The prosecutor subsequently moved to strike D. for cause, based on D.'s belief that the system did not work "evenly" for people of different races. The prosecutor argued D. looked uncomfortable and angry during voir dire, and she would be prejudiced against the prosecution.

Miles's lawyer disagreed, arguing that D. could still be fair and impartial even though she felt that people of color were treated unfairly in the criminal justice system. Counsel also noted D. said she would follow the law as given by the court, and she would avoid holding the prosecution to a higher standard. Stinson's lawyer also argued D. said she could be fair, and she had acted the same toward defense counsel as she had toward the prosecutor.

The court questioned D. further outside the presence of the other potential jurors. When asked, she clarified that she felt the criminal process was fair, but the outcome would be different depending on one's race. For example, if D. had an incident with a coworker, people would be more likely to believe her coworker because they would consider D. to be aggressive. In her experience, most people think that African-Americans are aggressive. Similarly, people could prejudge others in the criminal justice system. Still, she stated she would not do so, and race would not be a factor for her when she considered the evidence. However, if she felt the jury was deciding guilt based on race, she would vote against it "because you [are] basing something off of just his race versus everything that you gathered as a whole." She told the court she had not formed an opinion as to whether the defendants were guilty. She would not look more favorably upon defendants merely because they were African-American, nor would she use race as a factor in any of her determinations in the case.

21

After the questioning, the prosecutor renewed her motion to dismiss D. for cause. Counsel for Stinson disagreed, arguing D. had explained she could be fair and would base her decision on the evidence. The court denied the motion. When jury selection resumed, the prosecution excused D. with a peremptory challenge.

Outside the jury's presence, defendants made a *Batson/Wheeler* motion.[5] The prosecutor stated she had excused D. for legitimate race-neutral reasons. Counsel for Stinson noted that D. was the first African-American to be excused. He also argued that the prosecution was being disingenuous about her reasons for dismissing D., given that at least one white juror had been seated who said he believed police were more trustworthy. The prosecutor reiterated that D. not only worked with inmates as a psychology technician, she also had strong opinions about how African-Americans were treated and how that might affect the fairness of the instant trial. The prosecutor further argued that D. had negative life experiences and a bias against the system, believing that it worked against minorities. In addition, D. appeared uncomfortable in the courtroom and had stated in her questionnaire that she formed quick opinions.

The trial court found the prosecutor was not improperly motivated by race and denied defendants' motion. The trial court noted that D. had made conflicting statements about her perception of the system, and whether she would vote a certain way if everyone else's decision was based on race. Although D.'s experience and attitude toward "the system" and "people" might be more common among African-Americans, that did not preclude the prosecutor from excusing D.

B.    *Applicable law and analysis*

"A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished

---

[5]    *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008 (*Lewis and Oliver*).)

A *Batson/Wheeler* challenge involves three steps. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 138], fn. omitted.)

Where, as here, a defendant challenges the court's finding that the prosecutor's reasons were race-neutral (i.e., the third step of the *Batson/Wheeler* analysis), we consider the credibility of the prosecutor's justification. (*People v. Hamilton* (2009) 45 Cal.4th 863, 900.) Factors to be considered include " 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Ibid.*)

As our Supreme Court has explained, a prosecutor "does not offend *Batson* or *Wheeler* when [she] excuses prospective jurors who have shown orally or in writing, or through their conduct in court, that they personally harbor biased views." (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1016.) This is true even if the prospective juror is a member of a cognizable racial group, and their biased view or attitude "may be more widely held inside the cognizable group than outside of it." (*Ibid.*)

23

Because the existence of purposeful racial discrimination is a question of fact, we review the trial court's ruling to determine if it is supported by substantial evidence. (*People v. Hamilton, supra*, 45 Cal.4th at pp. 900-901.) "As long as the court makes 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' [Citation.]" (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1009.)

For example, in *Lewis and Oliver*, the defendant brought multiple *Batson/Wheeler* motions after the prosecutor excused six African-American males as jurors. (*Lewis and Oliver, supra*, 39 Cal.4th at pp. 1009-1010.) All but one of these prospective jurors had expressed opinions about the criminal justice system, including statements that racial minorities are targeted by police for pretextual traffic stops, wealthier crime victims are treated better by police, and the criminal justice system applies differently to racial minorities. (*Id.* at pp. 1010-1015.) The trial court found the prosecutor had stated race-neutral reasons for each dismissal and denied the defendant's motions, and our Supreme court agreed. (*Id.* at pp. 1009-1015.) In so doing, the court rejected the defendant's argument that it is unconstitutional for a prosecutor to strike a prospective juror who has " 'had an experience or expresses an opinion reflective of the minority perspective.' " (*Id.* at p. 1015.) The court reasoned that such an approach would prevent prosecutors from considering prospective jurors individually, and thereby "stand[ ] the law on its head" by "promot[ing] the very group stereotyping that *Batson* and *Wheeler* forbid." (*Lewis and Oliver*, at p. 1016.)

Similarly here, the trial court did not err in finding that the prosecutor was not motivated by race in excusing Prospective Juror D. Although D. said she thought the criminal process was fair, she also believed the outcome would be different depending on one's race. She also felt people assume African-Americans are aggressive, leading some to prejudge African-Americans in the criminal justice system. These statements indicate the prosecutor had reason for her expressed concern that D. would not be fair to the

24

People. To the extent defendants are correct that D.'s individual experiences and attitude might be more common among African-Americans, as explained in *Lewis and Oliver*, that did not preclude the prosecutor from excusing D. Although defendants contend that *Lewis and Oliver* was wrongly decided, we are bound to follow the precedent of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

IV

We turn next to Stinson's argument that the evidence was insufficient to establish the special circumstance under section 190.2, subdivision (a)(17)(A) that he murdered the father during the commission of a robbery attempt. According to Stinson, it is not possible that the jury believed the prosecutor's argument that Stinson fired his gun at the father and killed him, given that the jury found the gun enhancements to be not true. Stinson further argues there was strong evidence that Deloach and Owens were the shooters. The .10-millimeter gun used to kill the father was used in other crimes occurring between September 2015 and May 2016, and handguns similar to those used to kill the father (the .10-millimeter gun and .45-caliber Glock) were connected to Owens and Deloach. In addition, the evidence was insufficient to establish Stinson aided and abetted the murder, since the evidence of Stinson's involvement in the attempted robbery was limited. He had only limited phone contact with Owens on the day of the shootings. And, even though one of the girlfriend's children identified Stinson as one of the two men who came to the gate asking for the father, Stinson argues he could not have been involved because the son saw Stinson in his own front yard as the son jumped the fence to help the father.

Despite the jury's finding that the gun enhancements were not true, the People argue the jury still could have found Stinson was the father's actual killer. In the alternative, the People contend the evidence is sufficient to support a jury finding that Stinson aided and abetted the robbery. We agree with the People. First, under the

25

inconsistent verdict doctrine, the not true finding on the gun enhancements does not necessarily lead to a finding that Stinson was not the direct perpetrator of the substantive offenses.  Second, even if the jury convicted Stinson of the substantive offense under a vicarious liability theory, substantial evidence supported a verdict on that theory as well.

A.	*Standard of review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 715, italics omitted.)

" 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.'  [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise. (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient

substantial evidence to support" ' the jury's verdict. [Citations.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

B. *Despite the jury's inconsistent findings, substantial evidence supports Stinson's convictions*

Under section 954, "[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count." Courts have made clear that section 954 permits inconsistent verdicts to stand if they are otherwise supported by substantial evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) " '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405 (*Miranda*).) This rule applies to inconsistent enhancement findings, and to enhancement findings that are inconsistent with the verdict on the substantive offenses. (*Ibid.*) As our Supreme Court explained, a review for sufficiency of the evidence " 'should be independent of the jury's determination that evidence on another count was insufficient.' " (*Lewis, supra*, at p. 656.) "An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. [Citation.]" (*Ibid.*)

We find *Miranda* instructive. In that case, the defendant waited by the car while his two compatriots approached a man in a parked car and asked him to " 'share' " the marijuana he was smoking. (*Miranda, supra*, 192 Cal.App.4th at p. 404.) The man declined, so one of the other perpetrators yanked off the victim's necklace, and the victim chased him. The victim then heard gunshots and saw the defendant firing a handgun at him. The victim was shot twice. The defendant was caught after a high-speed car chase. During his testimony, the defendant acknowledged being present but claimed one of the other men was the shooter. (*Ibid.*) The jury found the defendant guilty of attempted murder, second degree robbery, and being a felon in possession of a firearm, and found true a gang enhancement. (*Id.* at pp. 402-403.) The jury also found true a principal gun-

27

use enhancement (§ 12022.53, subd. (e)(1)), but found not true the remaining firearm use enhancements (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a)). (*Miranda*, at p. 403.)

On appeal, the defendant in *Miranda* argued there was insufficient evidence to support his convictions for attempted murder, robbery, and his remaining charges, since the jury found all of the personal gun-use enhancement allegations to be not true. (*Miranda, supra*, 192 Cal.App.4th at p. 405.) The defendant argued the jury must have found him guilty of the charges only as an aider and abettor. He then argued the evidence was insufficient to establish that he acted as an aider and abettor. The appellate court disagreed, reasoning that the inconsistent verdicts did not necessarily mean that the jury found the defendant was not the direct perpetrator of the substantive offenses. (*Ibid*.) Although there was conflicting evidence, at trial, the victim identified the defendant as the shooter. (*Id*. at pp. 406-407.) In addition, there was substantial evidence that the defendant aided and abetted the substantive crimes. (*Id*. at p. 407.)

Similarly, in *People v. Federico* (1981) 127 Cal.App.3d 20, the court rejected the defendant's argument that his conviction for murder was inconsistent with the jury's finding that the gun enhancements (§§ 12022, subd. (a)), 12022.5), great bodily injury enhancement (§ 12022.7), and dangerous weapon enhancement (§ 12022, subd. (b)) were not true. (*Federico, supra*, at pp. 24, 31.) Acknowledging that the jury's findings on the enhancements were inconsistent with its guilty verdict on the murder charge, the court still found reversal was not required. (*Id*. at p. 31.) The court reasoned that section 954 resolved this inconsistency, and was persuaded by " ' " 'cases recognizing that such inconsistent verdicts may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain nor gain further advantage.' " ' " (*Federico*, at pp. 32-33.)

Similarly, here, substantial evidence supports Stinson's convictions for the substantive crimes, and we are not persuaded that Stinson's conviction for murder is inconsistent with the jury's not true findings on the gun enhancements. The girlfriend's

28

child identified Stinson as one of the two men who came to the father's home just before the shooting asking for the father. The son testified that after he heard shots and tried to jump a fence to reach the father, he recognized Stinson and saw Stinson holding a gun. Stinson then shot at the son. Witnesses then saw Stinson (along with Miles) fleeing the scene. Based on this evidence, the jury could have found that Stinson attempted to rob and then shot and killed the father. Under section 954, the jury's inconsistency is not grounds for reversal because substantial evidence supports the verdict.

D. *Substantial evidence also supports the theory that Stinson aided and abetted the murder and attempted robbery*

Even if we were to assume that the jury found Stinson guilty of murder and attempted robbery only as an aider and abettor, substantial evidence supports that theory as well. The special circumstance under section 190.2 is established for a defendant who is not the actual killer if (1) the defendant intended to kill (§ 190.2. subd. (c)); or (2) aided and abetted the commission of the robbery "with reckless indifference to human life and as a major participant." (§ 190.2, subd. (d).)

Section 190.2, subdivision (d) was drafted to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127]. (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) As our Supreme Court has explained, "*Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140], collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks, supra*, at p. 794.)

As described in *Banks*, in *Enmund*, the defendant drove two armed men to the victim's house so the men could rob the victim. (*Banks, supra*, 61 Cal.4th at p. 799.) The defendant waited nearby while the robbers entered the victim's home. During the course of the robbery, the victim's wife appeared with a gun, so the robbers shot and killed the victim and his wife. The defendant drove the robbers away from the scene and

helped them dispose of the weapons. The United States Supreme Court reversed the defendant's death sentence, reasoning he only intended to commit an armed robbery and only acted as the getaway driver. (*Ibid*.)

The court reached the opposite conclusion in *Tison*, where the two defendants helped plan and carry out the escape of two men from prison. (*Banks, supra*, 61 Cal.4th at p. 799.) The defendants brought weapons to the prison, armed the escapees, and held guards and visitors at gunpoint. Their car broke down during the escape, so they flagged down a family who was driving by in order to steal their car. (*Ibid*.) The defendants drove the family to the desert, where the two prisoners killed the family in the defendants' presence. (*Id.* at pp. 799, 802.) The United States Supreme Court affirmed the special-circumstance finding because the defendants were major participants who acted with reckless indifference to human life. (*Id*. at pp. 799-800.)

In considering whether a defendant's conduct is closer to *Tison* or *Enmund*, relevant factors may include: (1) the defendant's role in planning the crime that led to death; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; (4) the defendant's presence at the scene of the killing, including whether his own actions or inactions played a role in the death; and (5) the defendant's actions after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) Still, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*., quoting *Tison v. Arizona, supra*, 481 U.S. at pp. 152, 157.)

Here, there was sufficient evidence to establish Stinson was a major participant in the attempted robbery and acted with a reckless indifference to human life. The jury reasonably could have concluded Stinson helped plan the attempted robbery and was

30

present during its commission. One of the girlfriend's children identified Stinson as one of the two men who came to the father's home just before the shooting and asked for the father. And, the son and a neighbor saw Stinson at the scene immediately after the killing.

There also was substantial evidence that Stinson acted with reckless indifference to human life. Stinson was aware that there was at least one child at home during the attempted robbery, making it inherently dangerous. Stinson must have recognized the danger since, according to witnesses, he brought at least one gun with him to the attempted robbery. In addition, there was no evidence that Stinson tried to stop the killing of the father or assist him. And, Stinson made the situation even more dangerous by shooting at the son and then fleeing the scene with Miles. In sum, there is sufficient evidence that Stinson was either the actual killer or a major participant in the attempted robbery who acted with reckless indifference to human life.

V

We turn now to Stinson's challenge to his conviction for animal cruelty under section 597, subdivision (a), which provides that "every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal, is guilty of a crime." We find Stinson's arguments without merit.

A.      *The evidence was sufficient to establish Stinson committed animal cruelty*

Stinson first argues the prosecution was required to prove that he personally and intentionally killed the dog, and there is insufficient evidence to satisfy this standard. According to Stinson, he could not be guilty because the statute includes the phrase "maliciously and intentionally," and, at best, the dog was killed accidentally while he shot twice at the son. We disagree.

Stinson's argument was rejected in *People v. Alvarado* (2005) 125 Cal.App.4th 1179 (*Alvarado*), which found that section 597, subdivision (a) is a general intent statute.

31

(*Alvarado, supra*, at pp. 1185-1190.) As the court explained, "if the end in view is simply a proscribed act, the intent required is only a general one because no further acts or future consequences are envisioned from the illegal act. [Citations.] Conversely, when the end in view looks to a further consequence of the act, the intent is specific. [Citations.] Specific intent crimes typically contain such phrases as ' "with the intent to" ' achieve or ' "for the purpose of" ' achieving some additional result." (*Id.* at p. 1186.)

Conversely, the terms " 'willfully,' 'knowingly,' 'intentionally,' and 'maliciously' are expressions of general, not specific, intent when used in a penal statute." (*Alvarado, supra*, 125 Cal.App.4th at p. 1188.) " '[T]he term "intentionally" requires only that the agent acted intentionally in engaging in the proscribed conduct, and not that the agent knew that the conduct was proscribed.' " (*Ibid.*)

Since section 597, subdivision (a) does not state that a defendant must have an intent to do some further act or achieve some further consequence other than the proscribed acts, only general intent is required. (*Alvarado, supra*, 125 Cal.App.4th at pp. 1186-1187.) As such, a defendant's guilt can be established merely by showing that a defendant " 'acted intentionally in engaging in the proscribed conduct.' " (*Id.* at p. 1188.) In other words, it is not required to show that defendant had a specific intent to maim, mutilate, torture, wound, or kill an animal. (*Ibid.*)

We agree with the reasoning in *Alvarado* that section 597, subdivision (a) is a general intent crime. Viewing the record in the light most favorable to the judgment (*People v. Osband* (1996) 13 Cal.4th 622, 690), we find sufficient evidence to support Stinson's conviction for animal cruelty. One of the girlfriend's children heard a dog barking after the son ran out of the house, and then heard more gunshots. The son saw Stinson at the scene with a gun. A jury could reasonably infer Stinson intentionally shot the dog in an effort to stop it from barking or otherwise defending the father and the son.

Alternatively, as Stinson acknowledges, the jury could reasonably infer the dog was caught in the line of fire and accidentally killed as Stinson intentionally shot at the son.

B.   *The court properly instructed the jury regarding the elements of the animal cruelty charge*

Stinson next argues the jury instructions related to the animal cruelty charge were incomplete. The jury was instructed with CALCRIM No. 2953 as follows: "To prove that Mr. Stinson is guilty of [animal cruelty], the People must prove, one, Mr. Stinson killed a living animal, and two, Mr. Stinson acted maliciously. [¶] Someone acts maliciously when he intentionally does a wrongful act or when he acts with the unlawful attempt to disturb, annoy or injure an animal." The jury was also instructed that the animal cruelty charge only required general intent, which the instruction explained as follows: "For you to find a person guilty of these crimes or to find the allegation is true, that person must not only commit the prohibited act but must do so with a wrongful intent. [¶] A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intended to break the law. The act require[d is] explained in the instruction for that crime." (CALCRIM No. 252, as given.) According to Stinson, the instructions erroneously failed to instruct the jury that they could only find Stinson guilty of animal cruelty if he intentionally shot the dog.

Given our conclusion that section 597, subdivision (a) is a general intent crime, we also conclude that the instructions given properly stated the elements of the crime.

C.   *Any error in giving a limited and extraneous portion of instructions related to the natural and probable consequences doctrine was harmless*

Finally, Stinson argues the jury could have improperly found him guilty of the shooting of the dog on an aider and abettor theory, based on the prosecutor's closing argument and the court's instructions pursuant to CALCRIM Nos. 400 and 401. The People respond that Stinson forfeited the issue because he did not object at the trial court.

33

In the alternative, Stinson argues his counsel was ineffective because counsel failed to object to the instruction. Regardless, we find Stinson's contentions without merit.

### 1. *Additional background*

In discussing the attempted murder of the son during closing argument, the prosecutor argued: "And again, I have to ask you, what makes sense in this whole— remember the plants that are all broken up in the back? Remember the other holes in the fence? How do you think the dog got shot in his head? It wasn't from that first shot, which supplements and corroborates what [the son] told you, which was there was more than one shot. Now, whether or not the dog is collateral damage, whether or not they're shooting back there to try to shut the dog up, because the dog was being loud and barking, any which way you look at it, we have other new perforations inside of that fence that gives you other information. [¶] And, by the way, we know because it was a bullet hole in the head of the dog, it was not a shotgun. We know that based upon the evidence that was out there, there was no shotgun that was used. But we also know that, once again, there's independent evidence to prove to you that you're not being told the truth by some of the witnesses because, again, if there is not a shot down the direction of where [the son] is running, how does that dog up end dead? By a bullet wound. Look at the images. You can't deny the evidence."

Stinson's counsel responded that the prosecution wanted the jury to believe that Stinson fired twice at the son, with one of those shots hitting the dog. Counsel acknowledged it was possible the dog had been hit by a ricocheting bullet fired by Stinson, but argued there was insufficient forensic evidence to establish beyond a reasonable doubt that was how the dog died. During rebuttal, the prosecutor argued there was ample evidence that Stinson shot the dog. A police officer and field technician both testified the dog had a gunshot wound, and there were multiple holes in the back of the fence.

The jury was instructed regarding aiding and abetting pursuant to CALCRIM Nos. 400 and 401, including the following bracketed language that the bench notes state should be given if the prosecution is also relying on the natural and probable consequences doctrine: "Under some specific circumstances if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (CALCRIM No. 400.) The court then gave CALCRIM No. 401,[6] which the bench notes explain should be done when the prosecution's theory is that the defendant intended to aid and abet the target crimes. (Judicial Council of Cal., Crim. Jury Instns. (2010) Bench Notes to CALCRIM No. 400.) The court did not give CALCRIM Nos. 402 or 403, which the bench notes explain should be given when the prosecution's theory is that any of the crimes were committed as a natural and probable consequence of the target crime. (Judicial Council of Cal., Crim. Jury Instns. (2010) Bench Notes to CALCRIM No. 400.) The prosecution did not present a natural and probable consequences theory, and defense counsel did not object to the instructions.

---

[6] CALCRIM No. 401 states: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] [If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor]."

D.    *Analysis*

According to Stinson, the prosecutor's statements during closing that "they" might have been shooting to try to quiet the dog invited the jury to find Stinson guilty of animal cruelty based on his aiding and abetting the attempted robbery.  The instructions would have led the jury to think this was permissible since they were told that under " 'some' " unnamed " 'specific circumstances,' " they could find Stinson guilty of " 'other crimes that occurred during the commission' " of the crime that was aided and abetted.  Citing *People v. Chun* (2009) 45 Cal.4th 1172, Stinson argues we must overturn his conviction because it cannot be established beyond a reasonable doubt that the jury based its verdict on a legally valid theory.

To the extent the trial court erred in giving the extraneous bracketed portion of CALCRIM No. 400 (see *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1432 [the bracketed portion of CALCRIM No. 400 is superfluous unless the prosecution is relying upon the natural and probable consequences doctrine] (*Rivas*)), any error was harmless.

" 'With regard to criminal trials, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' [Citation.]  ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citation.]  If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " [Citation.]' [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182; *Rivas, supra*, 214 Cal.App.4th at p. 1429 & fn. 9.)

For example, in *Rivas*, the trial court instructed the jury with the same bracketed language in CALCRIM No. 400 at issue here, even though the prosecution did not rely on the natural and probable consequences doctrine.  (*Rivas, supra*, 214 Cal.App.4th at p. 1432.)  The appellate court found the error harmless because there were no further

36

instructions given on the doctrine, and neither party referred to the doctrine during their arguments to the jury. (*Id.* at p. 1434.) Similarly, in *People v. Prettyman* (1996) 14 Cal.4th 248, our Supreme Court found harmless the trial court's failure to specify the target crimes in its instructions regarding the natural and probable consequences doctrine, because the prosecutor's theory was that the defendant had encouraged or assisted his codefendant and was guilty of murder as an accomplice to the crime. (*Id.* at pp. 273-274.) As the court explained, when the parties make "no reference to the 'natural and probable consequences' doctrine in their arguments to the jury, it is highly unlikely that the jury [will have] relied on that rule." (*Id.* at p. 273.)

Similar to *Rivas* and *Prettyman*, none of parties here discussed the natural and probable consequences doctrine during closing arguments, and the only instruction the jury received about it was the bracketed paragraph. Although the prosecution mentioned in passing during closing argument that "they" may have been shooting at the dog to "shut [it] up," counsel for Stinson clarified that the prosecutor's theory was that Stinson fired twice at the son, with one of those shots hitting the dog. The prosecutor also argued in rebuttal that there was ample forensic evidence that the dog had been shot. In addition, the court never identified the "specific circumstances," making the superfluous instructional language meaningless. On this record, it is not reasonably likely that the jury interpreted the instructions as Stinson suggests, and his challenge lacks merit.

VI

We turn next to Stinson's contention that resentencing is required because the trial court was ambiguous during the sentencing hearing regarding whether the term for the animal cruelty charge (count 4) would run consecutively or concurrently. Stinson notes that the trial court indicated during its tentative ruling that it would impose a concurrent sentence on the charge, but eventually imposed a consecutive sentence. The People respond that Stinson has forfeited the issue because he failed to object to the change at the trial court. Regardless, we find Stinson's contentions without merit.

37

A. *Additional background*

During the sentencing hearing, the court stated its tentative ruling with respect to the determinate terms as follows: "As to [the attempted robbery count], that is a 16, 2, 3 triad. And the Court would be inclined to impose the 3-year State Prison term, upper-term, concurrent based on the rest of his sentence. . . . And on [the animal cruelty count], the sentence for 597 subsection A, the Court would be inclined to impose the upper-term of 3 years. It is a 16, 2, 3 offense. But run it concurrent to the rest of the counts."

After hearing argument and victim impact statements, the court announced its judgment with respect to counts 2 and 4 as follows: "With regard to [the attempted robbery count], the felony violation of [sections 664 and 211], second-degree robbery, the upper-term on that is 3 years. I am indicating that is the Court's selected term. But, actually, I believe that to be 654 in [the murder count]. [¶] . . . So it is stayed. With regard to [the animal cruelty count], 597(A) the upper-term on that is three years. I'm going to impose the upper-term. The reason I'm imposing the upper-term on that is because the allegations the dog was killed with a firearm for which not only was Mr. Stinson prohibited from having a firearm, but he had a conviction for being a felon in possession of a firearm previously. So with regard to his term, it is 3 years determinant sentence, followed by a life-term for [the murder count] followed by a consecutive, this is all consecutive, life without the possibility of parole." Stinson's counsel made no objection to this unambiguous change from the concurrent terms proposed in the tentative ruling to the consecutive terms imposed in the judgment.

After addressing concerns raised by Stinson's counsel regarding fines and fees imposed, restitution, and the description of credits in the probation report, the court asked twice if there was anything else. Each time, Stinson's counsel responded, "No."

The abstract of judgment states that the term for the animal cruelty count is consecutive.

B.    *Analysis*

Contrary to Stinson's contentions, the court made clear during its pronouncement of the judgment that the term for the animal cruelty count would run consecutively.  As Stinson concedes, the trial court had discretion to impose this authorized sentence, and we decline Stinson's invitation to infer ambiguity merely because the trial court changed its mind.  (See *People v. Coelho* (2001) 89 Cal.App.4th 861, 886 ["Where the court has discretion, the imposition of a consecutive, rather than concurrent, term represents a sentencing choice"]; see also *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646-647 [" '[A] court is not bound by its statement of intended decision and may enter a wholly different judgment than that announced' "].)

## VII

Finally, we turn to Miles's challenge to his conviction for the attempted murder of the son.  Miles first argues the evidence was insufficient to support his conviction, and the trial court therefore erred in denying his motion to dismiss under section 1118.1.  As Miles notes, the prosecutor's theory (as expressed during closing argument) was that Stinson was the shooter, and Miles was guilty of attempted murder because he had aided and abetted in the crime.  According to Miles, there was no evidence he said or did anything when he saw the son jumping the fence, and he was not armed.  Although he fled the scene and encouraged Stinson to hide his gun, Miles argues this is insufficient to establish he had the intent to kill the son.

In the alternative, Miles contends the jury's true finding on the premeditation allegation attached to the attempted murder count violates the Sixth Amendment.  In support of his argument, Miles cites *Alleyne v. United States* (2013) 570 U.S. 99 [186 L.Ed.2d 314], which holds that any fact that increases the minimum penalty for a crime is an element of the offense and must be submitted to the jury and found true beyond a reasonable doubt.  (*Id.* at p. 103.)  According to Miles, the premeditation element was omitted from the jury's deliberations because the court instructed that the jury could find

39

premeditation based on either his or Stinson's state of mind. In addition, argues Miles, the changes to sections 188 and 189 under Senate Bill 1437 mean that vicarious liability is no longer permitted for homicide crimes, meaning that he had to personally harbor the requisite mental state. His contentions are without merit.

A.   *Additional background*

Prior to closing argument, Miles's counsel filed a motion to dismiss under section 1118.1, arguing there was a lack of evidence presented as to Miles's culpability in the charged crimes. He argued there was no evidence Miles was armed, and the girlfriend's child was unsure of the identity of the second man who asked to see the father before the shooting. The prosecutor responded that the evidence against Miles was circumstantial. She noted that the son saw Miles at the scene just after the father was killed. In addition, witnesses saw Miles fleeing the scene and telling Stinson to put the gun down his pants. Given that there were at least two guns involved in the shootings, one could infer that Miles had already concealed his gun when the son saw him. The court agreed the evidence was sufficient and denied Miles's motion.

B.   *Sufficient evidence supported Miles's conviction for first degree attempted murder*

" ' "The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " [Citation.] "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." [Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the [trier of fact] for its determination." [Citation.] The sufficiency of the evidence is tested at the point the motion is made.

40

[Citations.] The question is one of law, subject to independent review.' [Citation.]" (*People v Maciel* (2013) 57 Cal.4th 482, 522.)

" 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 486.) When attempted murder is alleged, and guilt does not depend on the natural and probable consequences doctrine, the aider and abettor "must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

An aider and abettor's intent may be formed either before or during the commission of the crime. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) The jury may infer the defendant's intent from circumstantial evidence. (*People v. Beeman* (1984) 35 Cal.3d 547, 558-559.)

" 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; see also *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460 ["Neither mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone sufficient to establish that a person is an aider and abettor. Such evidence may, however, be considered together with other evidence in determining that a person is an aider and abettor"].) Flight can also be relevant in determining consciousness of guilt. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095.)

Reviewing the evidence here in the light most favorable to the judgment, we conclude there was sufficient evidence to support Miles's conviction for the attempted murder of the son. Although Miles's mere presence alone at the scene of the crime is insufficient to establish his role as a participant (*People v. Nguyen, supra*, 61 Cal.4th at p.

41

1055), the evidence showed Miles was actively involved in all the crimes that took place that day, including the attempted murder of the son. A jury could reasonably infer Miles was involved in the planning of the attempted robbery, given that he was later seen wearing the same black hoodie as the two men who showed up asking about the father. It was also reasonable to infer that Miles was a participant in the attempted robbery and murder of the father, since the son saw him grabbing the father at the time of the shooting. A neighbor also saw Miles try to enter the house. Given his active participation in these crimes, it was reasonable to infer that Miles perceived the son as a potential threat and intended to kill him. Even if Miles did not appear armed when the son saw him from the gate, it is reasonable to infer Miles had already hidden his gun, given that ballistics evidence established multiple guns were used to shoot the father, and Miles told Stinson to hide his gun as they fled. In addition, Miles did not attempt to help the father or the son, and Miles and Stinson fled the scene together. Stinson and Miles were the only people seen fleeing the scene. Under the circumstances, the trial court did not err in denying Miles's motion for acquittal.

C.    *Miles's conviction for first degree attempted murder did not violate his Sixth Amendment rights*

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded on other issues by Senate Bill 1437, as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

With respect to a perpetrator and a direct aider and abettor, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act

42

toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) In *Lee*, our Supreme Court considered application of section 664, subdivision (a)'s penalty provision to direct aiders and abettors. (*Id.* at pp. 624-625.) Based on the statutory language, the court concluded the statute does not require personal willfulness, deliberation, and premeditation of an attempted murderer in the context of direct aiders and abettors. (*Id.* at p. 623.) The court further reasoned, "such an attempted murderer necessarily acts willfully, that is with intent to kill. In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation—concepts that entail ' " 'careful thought and weighing of considerations' " ' and ' " 'preexisting reflection' " ' [citation], as opposed to 'mere unconsidered or rash impulse hastily executed' [citation]—because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing." (*Id.* at p. 624.)

In *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*), our Supreme Court extended *Lee* to aider and abettor liability for attempted premeditated murder under the natural and probable consequences doctrine. In *Favor*, the defendant was accused of committing the target offense of robbery as an aider and abettor, and of the nontarget offense of attempted murder as a natural and probable consequence of the robbery. (*Favor, supra,* at p. 874.) The jury was instructed pursuant to CALCRIM Nos. 402 and 601.[7] (*Favor*, at

---

**7** Specifically, the instruction per CALCRIM No. 402 in *Favor* read: " 'The defendant is charged in Counts 4 through 5 with robbery and in Counts 2 through 3 with attempted murder. [¶] You must first decide whether the defendant is guilty of robbery. If you find the defendant is guilty of this crime, then you must decide whether he is guilty of attempted murder. [¶] Under certain circumstances, a person who is guilty of one crime also may be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant is guilty of robbery; [¶] 2. During the commission of robbery, a co-participant in that robbery committed the crime of attempted murder, and [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known

43

pp. 874-875.)  The *Favor* court found no error with the instructions, reasoning "there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense.  It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation."  (*Id*. at p. 880.)

We decline Miles's invitation to disregard *Lee* and *Chiu* (see generally *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [we are required to follow decisions of our Supreme Court]), especially since the prosecutor argued Miles was guilty of attempted murder *only* as a direct aider and abettor.  *Chiu* made clear that a direct aider and abettor "may still be convicted of first degree premeditated murder . . . .  [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]  Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder.  [Citations.]  An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and

---

that the commission of attempted murder was a natural and probable consequence of the commission of the robbery.' "  (*Favor, supra*, 54 Cal.4th at p. 875.)

The jury in *Favor* was also instructed regarding the attempted murder/premeditation allegation pursuant to CALCRIM No. 601 that it needed to decide if the People had proved that the attempted murder ' "was done willfully and with deliberation and premeditation . . . .  The attempted murder was done willfully and with deliberation and premeditation if either the defendant or a principal or both of them acted with that state of mind.' "  (*Favor*, at p. 875.)

44

abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu, supra*, 59 Cal.4th at pp. 166-167.) We are persuaded this reasoning similarly applies to first degree attempted murder by a direct aider and abettor. In other words, *Alleyne* is not violated because the jury here was required to find Miles knew that Stinson intended to commit premeditated murder, and that Miles specifically intended to, and in fact aided or encouraged that crime. (See also *People v. McCoy, supra*, 25 Cal.4th at p. 1118 [direct aiders and abettors necessarily "know and share the murderous intent of the actual perpetrator"].)

D.  *Senate Bill 1437 and its changes to sections 188 and 189 do not apply to direct aiders and abettors*

Senate Bill 1437 amended the law governing murder liability under felony-murder and natural and probable consequences theories. (Stats. 2018, ch. 1015, §§ 1-4; see also *People v. Lewis, supra*, 11 Cal.5th at p. 959.) Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2) (Senate Bill 775), which went into effect January 1, 2022, clarified that a defendant convicted of attempted murder whose conviction is not yet final may on direct appeal challenge his conviction based on Senate Bill 1437's changes to sections 188 and 189. (§ 1170.95, subd. (g).)

However, the criminal liability of direct aiders and abettors did not change under Senate Bill 1437. (*People v. Gentile* (2020) 10 Cal.5th 830, 848; see also *People v. Offley* (2020) 48 Cal.App.5th 588, 595-596 [Senate Bill 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator' "].) As such, the instructions regarding premeditated attempted murder were not infirm under Senate Bills 1437 or 775.

## DISPOSITION

The judgments are affirmed.


       KRAUSE       , J.


We concur:


     BLEASE     , Acting P. J.


     HULL     , J.